MARTIN L. VIDRINE, JR. AND DEBBIE B. VIDRINE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vidrine v. Commissioner
Docket No. 21970-90
United States Tax Court
T.C. Memo 1993-308; 1993 Tax Ct. Memo LEXIS 307; 66 T.C.M. (CCH) 123; 16 Employee Benefits Cas. (BNA) 2697; July 14, 1993, Filed *307 Decision will be entered for respondent. For petitioners: Charles B. Sklar. For respondent: Mary Beth Calkins. CANTREL
CANTREL
MEMORANDUM OPINION CANTREL, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Petitioners Martin L. Vidrine, Jr., and Debbie B. Vidrine filed a joint Federal income tax return for 1986 with the Internal Revenue Service Center, Austin, Texas. On their return, they reported a payment they received from a profit-sharing plan using a special 10-year averaging method under section 402(e)(1)(B). By statutory notice of deficiency dated July 2, 1990, respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1986 in the amount of $ 8,329.08. Respondent arrived at this amount by increasing petitioners' income by $ 35,510 to *308 reflect the distribution received by them during 1986. The distribution is ordinary income not qualifying for the special 10-year averaging method, respondent's explanation stated, because under section 402(e)(4)(A) "separation from service of the employer is only upon death, retirement, resignation, or discharge, and not when the employee continues in the same job for a different employer." The increase in petitioners' adjusted gross income resulted in respondent's corresponding disallowance of petitioners' $ 555 medical expense deduction. The issue for us to decide is whether there was a separation from service sufficient to qualify the payment received by petitioners as a lump-sum distribution under section 402(e)(4)(A)(iii). Most of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners resided in Baton Rouge, Louisiana, at the time the petition was filed. Since October 1979, petitioner Martin L. Vidrine, Jr. (petitioner), had been employed by Parkem Industrial Services, Inc. (Parkem). Parkem was engaged in the business of high pressure water cleaning (hydroblasting) and chemical *309 cleaning of industrial plants, and employed approximately 200 people in eight locations in three States. In October 1985, Parkem sold 95 percent of its assets (the asset sale), including the Parkem name, to Texas Catalysts, Inc. (Catalysts), a company of approximately 50 employees engaged in the business of industrial catalyst cleaning. Parkem ceased business when the assets were sold in October 1985 but did not liquidate. Catalysts continued Parkem's business operations under the Parkem name and expanded its operations to include use of vacuum trucks and catalyst cleaning services. Catalysts offered all of the original Parkem employees the opportunity to continue their employment with Catalysts after the asset sale. Substantially all (95 percent) of Parkem's employees, including petitioner, continued their employment with Catalysts, retaining their employment service dates for vacation and sick leave purposes. The employees choosing to work for Catalysts were employed in similar if not the same positions. Parkem's two shareholders agreed to act as consultants for Catalysts for 6 months after the asset sale. Before the asset sale, petitioner was a technical services representative, *310 selling the hydroblast and chemical cleaning services, as well as performing the service work for Parkem. In addition to a base salary, he received a 2.5-percent commission on those jobs for which he both sold and performed the service work. After October 1985, petitioner worked for Catalysts as a sales representative selling the new services of catalyst cleaning and handling, in addition to the original hydroblasting and chemical cleaning services. He received the base salary and a 2.5-percent commission on all jobs he sold but no longer performed any service work. Petitioner had the same supervisor after the asset sale. Petitioner was a participant in Parkem's employee profit-sharing plan (the Plan) prior to the asset sale. The Plan was financed through Parkem's contributions and voluntary contributions of the employees into a trust fund consisting of such contributions and the accumulated earnings thereon. Each employee had an "Individual Reserve Account" reflecting that employee's portion of the trust fund. The Plan, in pertinent part, provided as follows: Any contributions made by the Plan participants in the Plan to the Plan, together with all income earned thereon, *311 shall always be fully vested in the particular employee. Company contributions shall be allocated among the Individual Reserve Accounts of the active participants at the end of each Plan Year, in the proportion that each participant's total compensation with respect to such year bears to the total compensation paid to all participants with respect to such year. The total compensation paid by the Company to a participant during a Plan Year shall be taken into account for the purposes of allocating the Company's contribution to the Plan. All company contributions shall be non-forfeitable, except in cases where a participant's service with the Company is terminated for reasons other than retirement, death or total and permanent disability. When a participant's service with the Company is terminated for any reason other than by death, retirement or total and permanent disability, a percentage of the share of his Individual Reserve Account based on the following formula shall be paid to such participant: Years of Service
Percent of Non-
with the Company
forfeitable Benefit
Less than 2 years
0%
2 years but less than 3
20%
3 years but less than 4
30%
4 years but less than 5
40%
5 years but less than 6
50%
6 years but less than 7
60%
7 years but less than 8
70%
8 years but less than 9
80%
9 years but less than 10
90%
10 years and over
100% *312 * * * PAYMENTS TO PARTICIPANTS: No participant, or his or her beneficiary, shall have any right to benefits under this Plan until one of the following events occur: (1) the participant's normal retirement age 65; (2) the actual retirement date which may be later than age 65; (3) the death of the participant; (4) the total and permanent disability of the participant; (5) the termination of the participant's service with the Company; or (6) the termination of the Plan. * * * In the event the Company elects to terminate the Plan, or completely discontinue contributions, all Individual Reserve Accounts shall become fully vested and non-forfeitable. * * * ALLOCATION OF FORFEITURES: If a participant terminates his service with the Company for reasons other than death, retirement or disability, and a break in service occurs, the forfeited portion of such participant's Individual Reserve Account shall be allocated to the remaining participants in the same ratio that the Company's contribution shall be allocated to the participant's Individual Reserve Account. * * * PLAN AMENDMENT OR TERMINATION: * * * In the event the Plan is terminated, each participant on such date shall *313 be entitled to a fully vested right in the entire unpaid balance of his or her account and each participant shall be paid his or her account in such manner as the Company shall determine. [Emphasis added.]
The Plan was not part of Parkem's assets sold to Catalysts. Catalysts did not assume any responsibility for the Plan. It therefore terminated in October 1985. Upon the Plan's termination, all Parkem employees became 100 percent vested in their account balances. Petitioner received a distribution of his interest in October 1986. The employees also received a summary regarding the taxation of the distribution which included a paragraph about the option of employees who chose to work for Catalysts after October 1985, to roll over their Parkem plan distribution into Catalysts' profit-sharing plan created in December 1985. When petitioners received the distribution in 1986, they did not elect to have it rolled over into Catalysts' plan. Petitioner was not 59-1/2 or disabled at the time of the distribution. Generally under section 402(a)(1), distributions from qualified profit-sharing plans are taxable as ordinary income in the year of distribution. Secs. 72, 402(a)(1). Lump-sum *314 distributions have been accorded preferential tax treatment since 1942. Revenue Act of 1942, ch. 619, tit. I, sec. 162(a), 56 Stat. 798, 862. Section 402(e)(1) provides a special 10-year forward averaging method for reporting the ordinary income portion of a lump-sum distribution. The effect of such method is to tax the distribution as if it had been received in 10 equal annual installments, thus reducing the tax impact on the recipient in the year of distribution. Burton v. Commissioner, 99 T.C. 622, 625 (1992). The term "lump-sum distribution" is defined in section 402(e)(4)(A) to include an amount that becomes payable to the recipient on account of the employee's separation from service. The phrase "separation from service" is not defined in the Code or regulations. To give effect to congressional intent, courts have looked to the language of the statute and its legislative history in construing the phrase. United States v. Johnson, 331 F.2d 943, 947-949 (5th Cir. 1964); Reinhardt v. Commissioner, 85 T.C. 511, 518 (1985). See generally United States v. American Trucking Associations, Inc., 310 U.S. 534, 542-545 (1940). *315 The phrase "separation from service" first appeared in the Code in 1942 when Congress enacted former section 165(b) providing capital gains treatment for distributions made on account of an employee's death or other separation from service. The phrase was intended by Congress, and has been interpreted by this Court, to apply to distributions made when the employee retires or severs the employee's connection with the employer. S. Rept. 1631, 77th Cong., 2d Sess. 138 (1942), 1942-2 C.B. 504, 607; [2]Reinhardt v. Commissioner, supra at 518-519; Oliphint v. Commissioner, 24 T.C. 744 (1955), affd. on another issue 234 F.2d 699 (5th Cir. 1956); Glinske v. Commissioner, 17 T.C. 562 (1951). *316 This Court has consistently followed the general guideline that separation from service "requires a change in the employment relationship in more than a formal or technical sense." Reinhardt v. Commissioner, supra at 520; Gegax v. Commissioner, 73 T.C. 329, 334 (1979); Gittens v. Commissioner, 49 T.C. 419, 424 (1968) (adopting the interpretation of the Court of Appeals for the Fifth Circuit in United States v. Johnson, 331 F.2d 943 (1964), of S. Rept. 1622, 83d Cong. 2d Sess. 54 (1954)). Cases construing "separation from service" have often involved a distribution from an employer-corporation which undergoes a change of ownership, reorganizes, merges, or completely liquidates, and the taxpayer-employee continues employment for the surviving entity. United States v. Johnson, supra; Edwards v. Commissioner, 906 F.2d 114 (4th Cir. 1990), affg. T.C. Memo. 1989-409; Martin v. Commissioner, 26 T.C. 100 (1956); Miller v. Commissioner, 22 T.C. 293 (1954), *317 affd. per curiam 226 F.2d 618 (6th Cir. 1955). In United States v. Johnson, supra, Lee Co. purchased over 99 percent of the outstanding stock of Waterman Steamship Co. (Waterman). On the day of acquisition, Waterman's newly elected board of directors voted to terminate the existing pension plan. The taxpayer, an employee of Waterman who held the same job both before and after the stock sale, received a lump-sum payment from the plan. Four months later, Lee Co. merged into Waterman. The Court of Appeals for the Fifth Circuit, to which this case is appealable, [3] interpreted the legislative history to evince a congressional intent to distinguish in these situations between termination of the corporate entity of the employer as opposed to mere termination of the plan, which is not a separation from service. Congress limited the concept of separation from service because it feared that corporate taxpayers would abuse the law by creating technical disappearances of a corporate entity in a tax-free reorganization not involving a substantial change in the makeup of employees. United States v. Johnson, supra at 951 *318 (interpreting S. Rept. 1622, 83d Cong. 2d Sess. 54 (1954)). Thus, the court in Johnson concluded, a separation from service after 1954 would occur only on the employee's death, retirement, resignation, or discharge; not when the employee continues on in the same job for a different employer as a result of a liquidation, merger, or consolidation of the former employer. Id. at 949; Gegax v. Commissioner, 73 T.C. at 334; Gittens v. Commissioner, 49 T.C. at 424; accord, United States v. Haggart, 410 F.2d 449 (8th Cir. 1969). But cf. Smith v. United States, 460 F.2d 1005, 1010 (6th Cir. 1972) (adopting Judge Tannenwald's interpretation in his concurring opinion in Gittens v. Commissioner, supra at 426).
We agree *319 with petitioners that the facts in this case differ from those in United States v. Johnson, supra, where the change in the employer corporation's ownership occurred as a result of a stock sale, followed by a merger of the acquiring corporation into the employer corporation. The Court of Appeals for the Fifth Circuit found no interruption in the employment relationship as the employer's business, along with all of its employees, remained intact "clothed in its original corporate cloak." United States v. Johnson, 331 F.2d at 954. In the instant case, Parkem's ownership changes as a result of an asset sale, there is no liquidation or merger, and technically petitioner does not continue to work for the old Parkem corporation. These differences are not enough for us to reach a different result, however. Petitioner continues to work for the new Parkem which carries on the old Parkem's business with substantially all of the old Parkem's employees, in substantially similar positions without a break in service. In our view, in this situation there is "no meaningful distinction between the transfer of stock and the transfer *320 of assets." Gittens v. Commissioner, 49 T.C. at 425, and the result should be no different from that in Johnson. Consequently, after review of the "bramblebush" [4] of case law in this area and consideration of the facts in this case, we conclude that the asset sale, while causing a technical change in Parkem's ownership, resulted in no meaningful interruption in petitioner's employment relationship. United States v. Johnson, supra; Gittens v. Commissioner, supra.
The distribution in the instant case fails to qualify as a lump-sum distribution for another reason. Petitioners bear the burden of demonstrating that petitioner's right to receive the distribution originated "on account of" his separation from the service of Parkem, rather than on account of the termination of its Plan. Rule 142(a); Sarmir v. Commissioner, 66 T.C. 82, 88 (1976) *321 (where plan terminated upon employer's sale of business before employee had become vested). Under the Plan's provisions, petitioner was only 60 percent vested in the Plan as of October 1985. Had petitioner separated from the service of Parkem without the occurrence of the Plan termination, he would have received a distribution totaling 60 percent of the nonforfeitable portion of his Individual Reserve Account. Upon the Plan's termination however, he became 100 percent vested and received a distribution of 100 percent of his account balance. Thus, we conclude that petitioner's distribution was paid solely on account of the Plan's termination and that any technical separation from service was, in this context, irrelevant. Sarmir v. Commissioner, supra at 88-89; Burton v. Commissioner, 99 T.C. at 632; Schlegel v. Commissioner, 46 T.C. 706 (1966). Petitioners have therefore failed to establish the causal relationship between any separation from service and the distribution as required by section 402(e)(4)(A)(iii). Furthermore, no policy purpose is served by permitting use of the special *322 averaging method in this situation where petitioners could have rolled over the distribution into Catalysts' plan. Favorable tax treatment of lump-sum distributions does not apply if the distributions are made on account of the termination of qualified pension and profit-sharing plans because such benefit could encourage abuses of early distributions unrelated to retirement purposes. Burton v. Commissioner, supra at 633; Reinhardt v. Commissioner, 85 T.C. at 525; see Edwards v. Commissioner, 906 F.2d 114 (4th Cir. 1990), affg. T.C. Memo. 1989-409. The instant case presents such a situation. In light of the foregoing, Decision will be entered for respondent. Footnotes
1. Section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Retaining the provision for capital gains treatment for lump-sum distributions from qualified trusts on account of the employee's death or other separation from service, Congress replaced sec. 165(b) with sec. 402(a)(2) in 1954. The phrase "separation from service" was moved to sec. 402(e)(4)(A)(iii)↩ in 1974 and is now part of the definition of lump-sum distribution. Employment Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 2005, 88 Stat. 829, 987.
3. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971).
4. Schlegel v. Commissioner, 46 T.C. 706, 708↩ (1966).